[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Jason Gray, hereinafter "Gray" seeks a new trial pursuant to section 52-270[1] of the Connecticut General Statutes for the State of Connecticut. Gray was found guilty of arson in 1990; the court (Gormley, J.) on November 30, 1990 sentenced him to a term of 15 years imprisonment suspended after six years and five years probation. His conviction was affirmed in State v. Gray,221 Conn. 713 (1992) cert. denied ___ U.S. 113 S.Ct. 207 (1992).
Gray on October 21, 1992 filed a petition for Habeas Corpus relief claiming insufficient evidence, which was earlier raised on direct appeal in State v. Gray, supra. On December 15, 1995 the Federal District Court for Connecticut dismissed the petition pursuant to the State of Connecticut's cross-motion for summary judgment which Gray has appealed.
The instant action was filed May 11, 1993 alleging newly discovered evidence. The petitioner, Gray argues again that the evidence for conviction was insufficient and asserts that the new evidence which affects the factual adequacy of the evidence given at the original trial would cause the jury to reach a different conclusion when added to the facts of the original trial. Gray further argues essentially that he was convicted on evidence that was false because it was incomplete with a fatal major omission
CT Page 8874 (emphasis added). Gray argues that the State failed to call any witnesses in this case and accordingly this court should infer that any testimony that could have been given would be unfavorable. In particular Gray asserts that Dr. Jack Hubbell, the State Criminologist who testified in the original case was not called in this case because he would now testify that the new information (newly discovered evidence) would contradict his first trial testimony.
The Supreme Court in State v. Gray, supra pp. 715-717 outlined the facts as follows:
 "The jury might reasonably have found the following facts. At the time of the July 7, 1989 fire, the defendant and Calvin Hugins both worked under the supervision of Peter Keselewski in the parts department at Ekblade Oldsmobile (Ekblade), an automobile dealership and service center in Hamden. The defendant had been employed in the parts department for two months, picking up and delivering parts to various automobile dealerships, garages and automotive body shops. Hugins had been employed as the clerk at the parts department service counter for two years, supplying parts to either the service center or retail customers.
 The parts department is located in a two story building. The first floor contained, inter alia, a service counter, metal bins and a desk. Ekblade used the service counter to display small quantities of high demand items such as oil filters and antifreeze. The metal bins contained small parts and various chemicals, including WD-40 and Siloo, a diesel fuel antigel. Ekblade did not store these chemicals on the second floor. The second floor, which can only be reached by a flight of stairs at the rear of the first floor, contained, in part, cartons of oil filters and large parts. It is a five foot by thirty-three foot room with a plywood floor, a concrete ceiling supported by joists, and rows of storage shelves.
 On July 6, 1989, at 3 p.m., the defendant informed Hugins that he had noticed a chemical smell emanating from the second floor of the parts department. Hugins, unable to detect any chemical odor, told the defendant to speak to their supervisor, Keselewski. Also that day, the defendant told an Ekblade employee from another department, Marianne McKeon, that he smelled something unusual coming from the second floor. McKeon, like Hugins, did not notice anything CT Page 8875 unusual but, similarly, urged the defendant to inform Keselewski. Later, at 4 p.m., Keselewski asked the defendant to close a window on the second floor. After returning from the second floor, the defendant said nothing about any unusual odors coming from the second floor. At no time did the defendant ever mention his concerns about chemical smells to Keselewski. Keselewski, like McKeon and Hugins, did not detect any chemical smell when he closed the parts department between 5:30 and 6 p.m.
 The next day, July 7, 1989, Hugins opened the parts department at 7 a.m. At 8 a.m., the defendant again told Hugins that he smelled chemicals emanating from the second floor. Hugins searched the second floor but did not notice any unusual chemical smell. Approximately fifteen minutes later, between 8:15 and 8:20 a.m., Hugins noticed that the defendant was restocking the parts counter with oil filters that the defendant had obtained from the second floor. At 8:30 a.m., when Keselewski called Hugins from another car dealership, the defendant was talking with McKeon. About twenty to twenty-five minutes after Hugins observed the defendant shelving the oil filters, Hugins saw smoke coming from the area of the stairs to the second floor. Hugins turned off the first floor lights and reported the fire by telephoning the "911" emergency number. The defendant told McKeon that he had to get his keys and rushed toward his desk in the rear of the first floor. McKeon, who attempted to follow the defendant but then turned back because of the blinding smoke, did not see the defendant again until sometime between 11 a.m. and 12 p.m. when he stated: "[T]hey think I did it."
 At 8:44 a.m., Hamden firefighters were sent to Ekblade and they arrived shortly thereafter. The firefighters encountered dense smoke and extreme heat and noticed flames in the eastern and southeastern corner of the second floor. By 9:30 a.m., approximately thirty-five to fifty firefighters were able to subdue the flames."
At the original trial the State presented as expert witnesses Robert Westervelt Hamden's fire marshall, Joseph Toscano, a senior arson inspector and Jack Hubbell, the chemist in the state forensic laboratory whose opinions showed that the fire was intentionally set. Westervelt at the original trial theorized that a flammable accelerant had been utilized to start the fire. In the first trial as in this petition for new trial Westervelt CT Page 8876 testified as to how he collected and had the cans brought to the State Forensic Lab for testing. He took samples from the floor area where he observed a "classic pour pattern." Westervelt took 9 samples to Hubbell for testing between July 31, 1989 and August 1, 1989.
Westervelt testified he took the following samples from the area of the second floor where the fire started: liquid that was sponged from the floor near the east wall (State's Exhibit R). (Westervelt had concluded from his examination of the scene that the fire started in the southeast corner of the second floor); debris from the floor near the south wall, (State's Exhibit Z); debris from the floor near the east wall, (State's Exhibit T; plywood from the edges of the burn pattern, (State's Exhibit U); floor level shelving from the south and east walls, (State's Exhibit V); melted materials, (State's Exhibit W); two aerosol cans, (State's Exhibits X and Y); six pieces of the 2' x 6' board, (State's Exhibit Z. The samples were placed in cans on July 10, 1989 and Hubbell analyzed these samples by means of gas chromatography, (State's Exhibits S, V, W, X, Z); the samples that Hubbell kept. Westervelt brought back the other samples which were stored in his locked closet in his office which included Exhibit T, which was not tested the first time in July 1989.
The method of analysis used by Hubbell on the five samples contained petroleum, distillate; (State's Exhibit X), the contents of one of the aerosol cans contained a low "boiling range petroleum distillate"; and 6 pieces of the 2' x 4' board reflected the presence of petroleum distillate with a medium range boiling point. On August 4, 1989 Westervelt brought 5 additional samples to the state laboratory for chromatographic analysis. Included in this sample was a can of "Siloo." The chromatographic analysis done by Hubbell found no correspondence between the petroleum distillates in the first group of samples and the known distillate in the second group of diesel anti gels brought up August 4, 1989.
On April 24, 1990 about a month before trial (evidence started May 4, 1990, jury selection in late April 1990) Hubbell was called upon to test State's Exhibit T and "Siloo." This test was done with a newly acquired spectrometer. Hubbell using the mass spectrometer to analyze the can of Siloo diesel anti gel given to the lab on August 4, 1989 concluded that the can, State's Exhibit T, provided to him in April 1990 was one and the CT Page 8877 same.
Gray now claims that the prosecution deliberately failed to inquire on direct examination as to whether the material found in State's Exhibit T was consistent with a burned "Siloo" product, and also was allowed to argue to the jury that Gray had taken a 15 ounce can of "Siloo" and had poured it on the floor and then ignited it before returning to the first floor to establish an alibi in the presence of two witnesses. Such claims should have been argued on the appeal of State v. Gray, supra.
At trial the defense presented its own expert who opined that based upon photos of the scene the fire might have been caused by heat radiating down from a ceiling bulb or possibly faulty wiring. Gray's expert also offered to the jury that the Siloo found in State's Exhibit T could have been tracked onto the floor by workers' shoes or by contamination.
The State offered Toscano to rebut the theory that "flashover" — the ignition of hot air and gases near the ceiling did not occur during the fire. Toscano testified there was insufficient heat fuel and oxygen present to produce flashover.
Gray claims that he was convicted on evidence that was false because it was incomplete with fatal omissions.
The petitioner, Gray, produced the depositions of two experts, Richard Hoffman and Paul DeFur. Hoffman had no experience or training in arson cases.
Hoffman, a civil engineer, substantially testified that the container State's Exhibit T at the time of the test had been compromised because of gaping holes that were evident at trial.
Paul DeFur, a chemist, never conducted gas chromatography/mass spectroscopy studies in an arson case. His testimony substantially argued by Gray is that:
 "Testing of Exhibit T, however did not produce results consistent with the contents of `Siloo' if previously exposed to heat. Instead the chromatogram was consistent with contents of `Siloo' having been exposed to evaporation, and the trapping of the evaporated molecules which had penetrated the porous walls of the deteriorated Exhibit T.
CT Page 8878
The deposition of Hubbell was taken after DeFur's deposition. The State points out that DeFur's contamination theory is based on quantitative as opposed to qualitative differences in the test data. Also the State points out that the Siloo in State's Exhibit T could reflect a composite picture of Siloo and other chemicals that became co-mingled during the course of the fire accounting for the different components present in Exhibit T than in the can (referred to as lab 6A). However, Hubbell again testified that the Siloo found in Exhibit T and that in 6A are the same "absolutely," unless there's another brand of product that contains the same components which give the same identities. Hubbell further disagreed with DeFur's theory of contamination by evaporation. Hubbell stated that Siloo would hardly evaporate at all because they possess significantly high boiling points and significantly low vapor pressures so that the molecules in question would probably not travel and could not be smelled more than three feet away if the Siloo can in fact leaked. Westervelt testified his desk was about three feet from the ventilated closet where the items were stored before the April 1990 test. Also Hubbell testified that if the can before testing was in any way compromised, it would have been noted. Dr. Henry Lee, Director of the Lab, who was called as a witness by Gray stated that standard operation procedure in his lab is to return a potentially compromised material to the requesting authority without testing it.
Dr. Lee testified that without conducting any scientific tests any opinions or theories would be pure speculation. The worksheet of the State Lab made no notations that Exhibit T was in any way compromised before it was tested.
 "The standard that governs the granting of a petition for a new trial based on newly discovered evidence is well established. The petitioner must demonstrate, by a preponderance of the evidence, that: (1) the proffered evidence is newly discovered, such that it could not have been discovered earlier by the exercise of due diligence; (2) it would be material on a new trial; (3) it is not merely cumulative; and (4) it is likely to produce a different result in a new trial." Asherman v. State, 202 Conn. 429, 434, 521 A.2d 578 (1987); see also Kubeck v. Foremost Foods Co., 190 Conn. 667, 670 461 A.2d 1380 (1983); Burr v. Lichtenheim, 190 Conn. 351, 355, 460 A.2d 1290 (1983). "This strict standard is meant to effectuate the underlying CT Page 8879 `equitable principle that once a judgment is rendered it is to be considered final,' and should not be disturbed by post-trial motions except for a compelling reason." Asherman v. State,
supra, quoting Steve Viglione Sheet Metal Co. v. Sakonchick, 190 Conn. 707, 713, 462 A.2d 1037 (1983); see also Besade v. Interstate Security Services, 212 Conn. 441, 452, 562 A.2d 1086 (1989). "In determining the potential impact of new evidence, the trial court must weigh that evidence in conjunction with the evidence presented at the original trial." Asherman v. State, supra; see also Kubeck v. Foremost Foods Co., supra, 669. "It is within the discretion of the trial court to determine, upon examination of all the evidence whether the petitioner has established substantial grounds for a new trial, and the judgment of the trial court will be set aside on appeal only if it reflects a clear abuse of discretion." Asherman v. State, supra; see also Kubeck v. Foremost Foods Co., supra 670.
Gray, as pointed out earlier in this discussion, asserts that the evidence is false because it omitted major facts and because the evidence presented to the jury was incomplete.
 "A new trial is required if `the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. . . .'" Giglio v. United States, 405 U.S. 150, 1154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).
From all the evidence this court has considered, including the after acquired testimony of the experts, nothing can be construed to have been omitted or is factually false. At best there is now different views regarding the contamination theory. This court cannot conclude that if all the evidence of the experts were heard by the jury that it is likely to produce a different result at trial.
 Whether a new trial should be granted does not turn on whether the evidence is such that the jury could extend credibility to it. A petition for a new trial is a civil action. The plaintiff has the burden of proof, by the preponderance of the evidence. "A petition will never be granted except on substantial grounds." State v. Grimes, supra, 325. The plaintiff must persuade the court that the new evidence he submits will probably not merely possibly, result in a different verdict at a new trial, or that an injustice has been done. Pradlik v. State, 131 Conn. 682, 686, 41 A.2d 906. CT Page 8880 It is not sufficient for him to bring in new evidence from which a jury could find him not guilty — it must be evidence which persuades the judge that a jury would find him not guilty.
Lombardo v. State, 172 Conn. 385, 390-91 (1977).
In addition to the experts the court heard testimony regarding the testing and again the Fire Marshall. The court is not persuaded that a jury would find the petitioner Gray not guilty at a new trial.
In order to consider newly discovered evidence there must be a showing that the petitioner made a diligent effort before trial.
At the start of trial, Gormley, J., had offered a continuance or mistrial so that Gray's attorneys could have gotten their own experts as to what the State's expert witness Hubbell intended to present at trial.
A petitioner seeking a new trial must have been diligent in his effort to fully prepare his case and `if the evidence couldhave been known with reasonable diligence a new trial will not begranted' (citations omitted). Williams v. Commissioner, 41 Conn. App. 515,528-9 (1996).
Counsel had been asked at the first trial if there was any reason to delay the trial and none was given.
The court is not persuaded by the testimony of counsel for Gray as to his efforts to obtain expert testimony now being presented as a basis for a new trial. Counsel for Gray at no time attempted to confront Hubbell concerning his report in April 1990. Counsel had an opportunity to cross examine Hubbell re any findings he had made during the first trial. The claim of being surprised by the testimony of Hubbell and his attempt find contradictory evidence from the experts he now presents cannot be classified as newly discovered evidence. He had the April 1990 report regarding State's Exhibit T and was offered time to guard against or have an expert as he now has presented. Gray offered his own expert at the time of trial. The jury had an opportunity to evaluate his theory as to the cause of the fire. Under the circumstances of this case the court is not persuaded by Gray that a jury would now accept the late experts Hoffman and DeFur to arrive at a favorable verdict for the petitioner. CT Page 8881
The other claims as to prosecutorial misconduct and evidentiary errors should have been presented in the direct appeal State v. Gray, 221 Conn. 713. No authority has been given for this court to now grant a new trial for such claims.
The petition for a new trial is denied.
Frank S. Meadow, Judge Trial Referee